**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1431

_____

MUHAMMAD LEACH,
                            Appellant

v.

KATHLEEN BISCOE, Corrections Unit Manager; ROBERT KELLEY, Corrections
Food Service Manager; JACOB S. DAVIS, Correctional Food Service Instructor; DIANE
DAYA, Correctional Food Service Instructor; NEIL INCH-DIORIO, Correctional Food
Service Instructor

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 4-20-cv-01429)
District Judge:  Honorable Matthew W. Brann

_____

Argued May 16, 2023

Before:  SHWARTZ, MONTGOMERY-REEVES, and ROTH, *Circuit Judges*.

(Opinion filed: November 20, 2023)

Michael A. Fazio
Christopher J. Merken
Will W. Sachse
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Simone Hunter-Hobson **[ARGUED]**
University of Pennsylvania School of Law

3400 Chestnut Street
Philadelphia, PA 19104

    *Attorneys for Appellant*

Tara J. Wikhian **[ARGUED]**
Pennsylvania Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

    *Attorney for Appellees*

_____

OPINION*

_____

MONTGOMERY-REEVES, *Circuit Judge.*

Muhammad Leach appeals the District Court's order granting Defendants summary judgment on the First-Amendment retaliation claim that he brought under 42 U.S.C. § 1983. Because the record contains no evidence that Leach suffered an adverse action, we will affirm the District Court's order.

## I.    BACKGROUND[1]

### A.    Leach Files a Grievance Asserting His Right to Pray at Work

Leach is a devout Muslim incarcerated in the State Correctional Institution at Coal

---

* This disposition is not an opinion of the full court and under I.O.P. 5.7 does not constitute binding precedent.

[1] Because Leach appeals the District Court's grant of summary judgment, we resolve all disputed facts—and draw all reasonable inferences—in his favor. *See, e.g.*, Fed. R. Civ. P. 56(a); *DL Res., Inc. v. FirstEnergy Sols. Corp.*, 506 F.3d 209, 216 (3d Cir. 2007) ("We

Township ("SCI Coal Township"), a prison in the Pennsylvania Department of Corrections ("DOC"). On September 24, 2019, Leach took a break during his morning shift at the Dietary Department to pray. Jacob Davis, a Food Service Instructor at SCI Coal Township, approached Leach and told him that he was not allowed to pray at work. Leach explained to Davis that, as a Muslim, he needed to pray five times a day at fixed times. Davis told Leach that he was aware of the tenents of the Muslim faith, but Leach could not pray at work.

Later that day, Leach submitted a form "asking to be switched to maintenance and out of the kitchen as soon as possible." J.A. 303. Prison officials gave Leach an employment survey and placed him on the waitlist for a job with the Maintenance Department.

On October 14, 2019, Leach filed a grievance under the DOC's Inmate Grievance System ("Grievance No. 829861").[2] The grievance alleged that "Dietary Supervisors" violated Leach's rights under the First Amendment by prohibiting him from praying during his shift. J.A. 105. Leach explained that because he was "forced to work from 5:00am to 1:00pm," he needed an accommodation to participate in morning prayer, "the

---

resolve all factual doubts and draw all reasonable inferences in favor of . . . the nonmoving party." (citing *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005))).

[2] The Inmate Grievance System is an administrative procedure that allows inmates to grieve "a wide range of issues, procedures, or events that may be of concern." J.A. 47 § 1(A)(2). It is governed by the rules and procedures stated in DC-ADM 804.

most important prayer" of the day. *Id.*[3]

After Leach filed Grievance No. 829861, Neil Inch-Diorio, a Food Service Instructor at SCI Coal Township, told Leach that "removal from [his] dietary work assignment [was] warranted" while the grievance was pending. J.A. 291. Leach told Robert Kelley, a Food Service Manager at SCI Coal Township, that he was afraid that Inch-Diorio and other staff members would retaliate against him for filing a grievance. Kelley ordered Leach to stop reporting to work until the grievance was resolved and said that he would speak to Inch-Diorio, Davis, and other staff members about Leach's concerns.

### B. Daya Files a False Misconduct Charge Against Leach and Prison Officials Deny Leach's Initial Grievance

On November 5, 2019, Diane Daya, a Food Service Instructor at SCI Coal Township, filed a false misconduct charge against Leach under the DOC's Inmate Discipline Policy.[4] The charge alleged that Leach violated prison rules by "[r]efusing to work." J.A. 108. Daya explained that she had called the "housing unit to see why inmate Leach didn't report for work" and was "informed . . . that inmate Leach refused. Inmate Leach also refused the entire month of October." *Id.* Daya recommended that prison officials handle the charge through the informal resolution process, a procedure reserved

---

[3] Leach clarified that he did not "have any problems with" this schedule, so long as he had an opportunity to pray. J.A. 105.

[4] The Inmate Discipline Policy is an administrative procedure that the DOC uses to adjudicate charges that an inmate violated prison rules or regulations. It is governed by the rules and procedures stated in DC-ADM 801.

4

for less serious violations that does not involve a formal misconduct hearing.

At some point, Leach raised concerns about the misconduct charge with Daya. Daya responded by telling Leach "that since [he] like[s] to file grievances, [he] [would] have to take the misconduct report up with . . . [Kathleen] Biscoe," J.A. 292, Leach's Unit Manager at SCI Coal Township.

On November 8, 2019, Biscoe held an informal resolution meeting with Leach about the misconduct charge. During the meeting, Leach asked Biscoe "to dismiss the misconduct report and to exonerate [him] of the charge of refusal to work." J.A. 292. Leach "explained . . . that [he] never refused to work; but instead, . . . Kelley ordered [him] not to return to work until the issues in [his] grievance were resolved . . . ." *Id.* Biscoe contacted Kelley, and he confirmed Leach's version of events.

Later that day, Biscoe issued an Informal Resolution Action Form stating that she resolved the misconduct charge with "No Action." J.A. 109. Leach did not receive any punishment as a result of this "No-Action" resolution. And the DOC does not consider charges resolved through the informal resolution process—like Daya's false misconduct charge—to denote misconduct for purposes of an inmate's parole or pre-release. But Leach's "block and work reports" continued to indicate that prison officials resolved a misconduct charge against him with "No Action" through the informal resolution process. *See* J.A. 70 § 2(C)(4).[5]

---

[5] Leach did not attempt to appeal Biscoe's "No-Action" resolution under the Inmate Discipline Policy.

5

On November 19, 2019, Kelley issued an Initial Review Response denying Grievance No. 829861. Among other things, Kelley explained that prison policies did not allow Leach to pray at work "unless express written permission is granted by the Facility Manager in consultation with the Religious Services Administrator." J.A. 104.[6] Leach fully appealed Grievance No. 829861 under the Inmate Grievance System. Prison officials denied his appeal at each stage, explaining that staff complied with prison policies and Leach purportedly failed to request an accommodation through the proper channels.

### C.     Leach Receives a New Work Assignment and Files a Second Grievance

On February 11, 2020, prison officials approved Leach's request to work at the Maintenance Department. Leach's new role paid $0.42 per hour, the same hourly wage that he earned with the Dietary Department. But Leach earned less money overall because he worked one fewer hour per week with the Maintenance Department than he had worked at the Dietary Department.

About two weeks later, Leach filed a second grievance under the Inmate Grievance System. This grievance alleged that Kelley, Daya, Inch-Diorio, and Davis retaliated against Leach for filing his initial grievance (*i.e.*, Grievance No. 829861) "by removing [him] from [his] dietary work assignment." J.A. 121. Leach added that his "current work assignment at electrical maintenance pays less, .42/7 hours, than [his] work

---

[6] While Leach's appeals were pending, SCI Coal Township "direct[ed] . . . staff to permit inmates to pray." J.A. 98.

assignment [in] dietary." *Id.* The grievance did not mention Daya's false misconduct charge or Biscoe's "No-Action" resolution. Indeed, Leach did not even name Biscoe as a respondent. Prison officials denied Leach's grievance and he fully appealed that denial under the Inmate Grievance System.

### D. The District Court Grants Summary Judgment

In August 2020, Leach filed a complaint in the United States District Court for the Middle District of Pennsylvania. The complaint alleged that Leach was entitled to relief under 42 U.S.C. § 1983 because Biscoe, Kelley, Davis, Daya, and Inch-Diorio (collectively, "Defendants") violated the First Amendment by retaliating against Leach for filing grievances. The complaint identified two alleged acts of retaliation: (1) Daya's false misconduct charge, which Biscoe resolved with "No Action" under the Inmate Discipline Policy; and (2) Leach's reassignment from the Dietary Department to the Maintenance Department.[7]

In July 2021, Defendants moved for summary judgment. Their main argument was that Leach's First Amendment retaliation claim failed on the merits because he

---

[7] Leach also alleged that Biscoe's "No-Action" resolution violated his right to procedural due process under the Fourteenth Amendment. The District Court dismissed this claim under 28 U.S.C. § 1915(e)(2)(B)(ii) because Leach "ha[d] not identified an individual liberty or property interest that was infringed by the informal resolution process he alleges was procedurally deficient." *Leach v. Biscoe*, No. 4:20-cv-01429, 2022 WL 453537, at *6 (M.D. Pa. Feb. 14, 2022). Leach does not raise any issues related to this claim on appeal, so we do not address it. *See, e.g.*, *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 230 n.17 (3d Cir. 2016) ("An Appellant waives an argument in support of reversal if he does not raise that argument in his opening brief." (quoting *AT&T Inc. v. FCC*, 582 F.3d 490, 495 (3d Cir. 2009), *rev'd on other grounds*, 562 U.S. 397 (2011))).

7

provided no evidence of adverse action or retaliatory animus. But as a fallback, Defendants argued that Biscoe was entitled to summary judgment under the Prison Litigation Reform Act of 1996 ("PLRA") because Leach failed to exhaust his administrative remedies before suing her in federal court. *See* 42 U.S.C. § 1997e(a) (requiring that a prisoner exhaust available administrative remedies before suing in federal court).

Leach filed a pro se brief opposing Defendants' motion for summary judgment. Among other things, Leach argued that he did not procedurally default on his claim against Biscoe because the DOC did not make any administrative remedies available for inmates to challenge a retaliatory misconduct charge resolved with "No Action" under the Inmate Discipline Policy's informal resolution process.

In February 2022, the District Court issued a memorandum opinion and order granting Defendants' motion for summary judgment. *See Leach*, 2022 WL 453537, at *5–8. The District Court held that Leach "procedurally defaulted on the claim that he was retaliated against by Daya's filing of a false misconduct report against him" because he purportedly failed to properly raise that issue under the Inmate Grievance System.[8] *Id.* at *5. The District Court then dispensed with Leach's job-reassignment theory of retaliation on the merits, holding that Defendants were entitled to summary judgment

---

[8] We express no view on the District Court's analysis of administrative exhaustion.

because Leach failed to provide evidence of retaliatory animus.[9]

Leach appeals the District Court's order granting summary judgment.

## II.    DISCUSSION[10]

Leach's primary argument on appeal is that the District Court erred by holding that the PLRA barred his retaliation claim based on Daya's false misconduct charge because he failed to exhaust administrative remedies. We need not resolve that issue, however, because the record contains no evidence that the misconduct charge was an adverse action.

Leach brings his First Amendment retaliation claim under § 1983, which creates a private cause of action against persons who, acting under color of state law, deprive "any citizen of the United States or other person within the jurisdiction thereof . . . of any rights, privileges, or immunities secured by the Constitution and laws." To establish a claim for retaliation, Leach must show that "(1) he was engaged in constitutionally

---

[9] Leach does not raise any issues related to his job-reassignment theory of retaliation on appeal, so we do not address it. *See, e.g.*, *Halle*, 842 F.3d at 230 n.17.

[10] The District Court had subject-matter jurisdiction over this case under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

We review "a grant or denial of summary judgment de novo, applying the same standard as the District Court." *Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir. 2008) (citing *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007)). "Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law." *DL Res.*, 506 F.3d at 216 (citing *Celotex Corp. v. Catrett¸* 477 U.S. 317, 322–23 (1986)). When determining whether a party is entitled to summary judgment, "[w]e resolve all factual doubts and draw all reasonable inferences in favor of . . . the nonmoving party." *Id.* (citing *Hugh*, 418 F.3d at 267).

protected conduct, (2) 'he suffered some "adverse action" at the hands of prison officials,' and (3) 'his constitutionally protected conduct was "a substantial or motivating factor" in the decision' to take that action." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).

"An adverse action is one 'sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *Watson v. Rozum*, 834 F.3d 417, 422 n.6 (3d Cir. 2016) (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). To be an adverse action, the challenged conduct need only cause "more than [a] *de minimis*" adverse consequence for a prisoner. *Id.* at 423 (alterations in original) (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006))).

On appeal, Leach offers one explanation for how Daya's false misconduct charge constituted adverse action: "Biscoe's 'no action' adjudication through the informal resolution process with respect to the falsified misconduct charge . . . will forever and always be 'reflected on [Mr. Leach's] applicable block and work reports." Reply Br. 7–8 (alteration in original) (quoting J.A. 70 § 2(C)(4)).[11] Leach speculates that this notation "could negatively impact his reputation with work supervisors and may fuel [a] false narrative that [he] is an unreliable worker." *Id.* at 8.

When responding to a motion for summary judgment, it is not enough for Leach to

---

[11] Leach concedes that he did not receive any sanction as a result of Daya's false misconduct charge. Opening Br. 23 ("Leach could not appeal his informal resolution because he did not believe that the sanction was disproportionate to the offense—indeed, he suffered no sanction (other than the recording of the disciplinary action itself).").

offer a plausible argument for how he might have suffered an adverse action. Leach must point to *evidence* capable—after "resolv[ing] all factual doubts and draw[ing] all reasonable inferences in [his] favor," *DL Res.*, 506 F.3d at 216 (citing *Hugh*, 418 F.3d at 267)—of supporting a reasonable jury's verdict that he suffered an adverse action. *See Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) ("A factual dispute is 'genuine' and thus warrants trial 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986))). Thus, Defendants are entitled to summary judgment if Leach adduced no evidence supporting his theory of adverse action. *See id.* ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." (quoting *Celotex*, 477 U.S. at 322–23)).

Careful review of the record reveals that Leach offered no evidence to support his theory of adverse action. To show an adverse action, Leach points to a provision of the Inmate Discipline Policy stating that "informal resolutions . . . should be reflected on applicable block and work reports." J.A. 70 § 2(C)(4). This provision supports a reasonable inference that Leach's "block and work reports" indicate that prison officials resolved a misconduct charge against him with "No Action" under the informal resolution process. It is a step too far, however, to infer that because Leach's records continue to show this information, prison officials took or may take actions against him that would negatively "impact different facets of his life inside the prison." Reply Br. 8. And Leach provides no evidence that would enable us to make that inferential leap. For example, Leach cites no evidence suggesting that prison officials, work supervisors, or

other relevant people take an unfavorable view of inmates who have a history of misconduct charges resolved with "No Action" under the informal resolution process. *Cf.* J.A. 241 (Chief Hearing Examiner's Decl.) ("'No Action' in essence means not guilty."). Similarly, Leach offers no evidence that prison officials viewed his "No-Action" resolution as derogatory, or that he suffered—or expects to suffer—any negative consequence from Biscoe's "No-Action" resolution. Indeed, the record does not even contain evidence describing the general information a "block and work report" contains, who has access to the reports, or how they are used.[12]

Accordingly, we hold that the District Court did not err by granting Defendants' motion for summary judgment. "We may affirm on any basis supported by the record, even if it departs from the District Court's rationale." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019) (citing *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1089 & n.10 (3d Cir. 1988)). Leach's First Amendment retaliation claim fails on the merits because the record contains no evidence that the false misconduct charge was an adverse action. Thus, Defendants were entitled to summary judgment on this claim.[13]

---

[12] Leach's theory of adverse action also seems to conflict with the undisputed facts. Even after receiving the "No-Action" resolution, Leach got the job he requested in the Maintenance Department. J.A. 274–75. This fact suggests that Leach did not suffer work-related adverse consequences.

[13] Our holding today is a narrow one based on the record that the parties presented on appeal. We therefore express no view on whether an inmate could establish that a "No-Action" resolution constituted adverse action by providing evidence of collateral consequences flowing from the applicable notation on their "block and work reports," such as negative treatment by prison officials, work supervisors, or other relevant people in the prison environment.

## III.    CONCLUSION

For the reasons discussed above, we will affirm the District Court's order granting Defendants' motion for summary judgment.